FILED

JUL 17 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 18 CR 48 |
| v. ) | |
| ) | Violations: Title 18, United States Code, |
| EDWARD BASES and ) | Sections 1348, 1349, and 2; Title 7, United |
| JOHN PACILIO, ) | States Code, Sections 6c(a)(5)(C) and 13(a)(2) |
| ) | |
| Defendants. ) | |

JUDGE LEE

MAGISTRATE JUDGE WEISMAN

<u>COUNT ONE</u>
(Conspiracy to Commit Wire Fraud
Affecting a Financial Institution and Commodities Fraud)

The SPECIAL JUNE 2018 GRAND JURY charges:

1.  At times material to this Indictment:

**The Defendants and Related Entities**

a. EDWARD BASES was employed as a precious metals trader at Bank A through its subsidiary from approximately June 2010 until approximately November 2015, and was based in New York, New York. BASES traded precious metals futures contracts in his capacity as a precious metals trader at Bank A. Prior to working at Bank A, BASES was employed as a precious metals trader at Bank B from approximately July 2008 until approximately June 2010, and was based in New York, New York. BASES traded precious metals futures contracts in his capacity as a precious metals trader at Bank B.

b. JOHN PACILIO was employed as a precious metals trader at Bank A through its subsidiary from approximately October 2007 until approximately June 2011, and was based in New York, New York. PACILIO traded precious metals futures contracts in his capacity as a precious metals trader at Bank A. After working at Bank A, and beginning in approximately

June 2011, PACILIO was employed as a precious metals trader at Bank C through its subsidiary, and was based in New York, New York.

    c.  Co-Conspirator 1 ("CC-1") was employed as a precious metals trader at Bank A through its subsidiary from approximately June 2007 until approximately December 2013, and was based in London, England. CC-1 traded precious metals futures contracts in his capacity as a precious metals trader at Bank A.

    d.  Bank A, together with its subsidiaries and affiliates, was a global banking and financial services company. Bank A had operations in the United States and abroad, and operated global commodities trading businesses that included the trading of precious metals futures contracts. Bank A was a financial institution within the definition of 18 U.S.C. § 20.

    e.  Bank B, together with its subsidiaries and affiliates, was a global banking and financial services company. Bank B had operations in the United States and abroad, and operated global commodities trading businesses that included the trading of precious metals futures contracts.

    f.  Bank C, together with its subsidiaries and affiliates, was a global banking and financial services company. Bank C had operations in the United States and abroad, and operated global commodities trading businesses that included the trading of precious metals futures contracts.

**Market Background and Definitions**

    g.  A "futures contract" was a standardized, legally binding agreement that, once executed, obligated the parties to the contract to buy or sell a specific product or financial instrument in the future. That is, the buyer and seller of a futures contract agreed on a price at the

time of execution for a product or financial instrument to be delivered (by the seller) in exchange for money (to be provided by the buyer) on a future date.

  h. Futures contracts were traded on markets designated and regulated by the United States Commodity Futures Trading Commission.

  i. The CME Group Inc. ("CME Group") was a commodities marketplace made up of several exchanges, including COMEX, and was a "registered entity" with the United States Commodity Futures Trading Commission.

  j. COMEX utilized an electronic trading system called Globex, which allowed market participants to trade futures contracts from anywhere in the world. The CME Group operated Globex using computer servers located in Chicago and Aurora, Illinois.

  k. Traders using Globex could place orders in the form of "bids" to buy or "offers" to sell one or more futures contracts at various prices, or "levels."

  l. Trading on Globex was conducted electronically using a visible "order book" that displayed quantities of anonymous orders (i.e., offers to sell futures contracts and bids to buy futures contracts).

  m. An order was "filled" or "executed" when a buyer's bid price and a seller's offer price matched for a particular contract.

  n. The minimum price increment at which a futures contract could trade on COMEX was called a "tick," and the value of a tick for each contract was set by COMEX.

  o. A "lot" was the number of contracts that comprised the minimum order in the relevant futures market.

  p. Futures contracts traded on set, periodic expiration cycles (i.e., monthly or quarterly).

q. An "iceberg" order was a type of order that traders could place when trading precious metals futures contracts on COMEX. In an iceberg order, the total amount of the order was divided into a visible portion of a certain pre-set quantity that was visible to other market participants, and a portion of the order (i.e., the remainder of the order) that was not. Whenever the visible portion of the order was filled, the same, pre-set quantity of the remaining, hidden portion automatically became visible; this process repeated until the entire remainder of the order was either executed or canceled.

r. Precious metals futures contracts included gold, silver, platinum, and palladium futures contracts, which were contracts for the delivery of gold, silver, platinum, and palladium, respectively, in the future at an agreed-upon price. The gold, silver, platinum, and palladium futures contracts were traded on COMEX, using the Globex system.

s. "Spoofing" was the act of bidding or offering with the intent, at the time the bid or offer was placed, to cancel the bid or offer before execution.

t. All dates and times referenced in this Indictment are approximate and are in Central Standard Time or Central Daylight Time.

2. Beginning in or around 2007 and continuing through in or around at least 2013, the exact dates being unknown to the Grand Jury, in the Northern District of Illinois, Eastern Division, and elsewhere,

EDWARD BASES and
JOHN PACILIO,

defendants herein, conspired and agreed with others known and unknown to the Grand Jury to commit the following offenses:

a. to knowingly and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of

4

materially false and fraudulent pretenses, representations, and promises, knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing the scheme and artifice, all affecting a financial institution, including Bank A and financial institution counterparties, in violation of Title 18, United States Code, Section 1343; and

    b. to knowingly and with the intent to defraud, execute and attempt to execute a scheme and artifice to defraud a person in connection with a commodity for future delivery, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of a commodity for future delivery, that is, precious metals futures contracts, in violation of Title 18, United States Code, Section 1348.

### Purpose of the Conspiracy

3. The purpose of the conspiracy was to deceive other market participants by injecting materially false and misleading information into the precious metals futures market that indicated increased supply or demand in order to induce market participants to buy or to sell precious metals futures contracts at prices, quantities, and times that they would not have otherwise, in order to make money and avoid losses for themselves and the financial institutions that employed them.

### Manner and Means of the Conspiracy

4. It was part of the conspiracy that BASES, PACILIO, CC-1, and others placed one or more visible orders for precious metals futures contracts on one side of the market that, at the time they placed the orders, they intended to cancel before execution (the "Fraudulent Orders").

5. It was further part of the conspiracy that by placing the Fraudulent Orders, BASES, PACILIO, CC-1, and others intended to inject false and misleading information (i.e., orders they

did not intend to execute) into the market to create the false impression of increased supply or demand.

6. It was further part of the conspiracy that this false and misleading information would, at times, cause other market participants to buy and to sell futures contracts at quantities, prices, and times that they otherwise would not have, because, among other things, market participants reacted to the apparent increase in supply or demand.

7. It was further part of the conspiracy that BASES, PACILIO, CC-1, and others placed Fraudulent Orders to buy, which created the false impression in the market of increased demand, which was intended to drive commodity futures prices up.

8. It was further part of the conspiracy that BASES, PACILIO, CC-1, and others placed Fraudulent Orders to sell, which created the false impression in the market of increased supply, which was intended to drive commodity futures prices down.

9. It was further part of the conspiracy that BASES, PACILIO, CC-1, and others placed lower visible quantity orders, often in the form of iceberg orders, on the opposite side of the market that they intended to execute (the "Primary Orders").

10. It was further part of the conspiracy that BASES, PACILIO, CC-1, and others placed Fraudulent Orders with the intent to artificially move the prevailing price in a manner that would increase the likelihood that one or more of their Primary Orders would be filled.

11. It was further part of the conspiracy that the Fraudulent Orders placed by BASES, PACILIO, CC-1, and others were material misrepresentations that falsely and fraudulently represented to market participants that BASES, PACILIO, CC-1, and others were willing to trade the Fraudulent Orders when, in fact, they were not because, at the time the Fraudulent Orders were placed, BASES, PACILIO, CC-1, and others intended to cancel them.

12. It was further part of the conspiracy that BASES, PACILIO, CC-1, and others intended to, attempted to, and generally did, cancel the Fraudulent Orders before any part of the Fraudulent Orders were executed. The Fraudulent Orders placed by BASES, PACILIO, CC-1, and others exposed Bank A to losses in the form of: (a) monetary trading losses associated with the trading risk that the Fraudulent Orders would be executed; (b) costs and expenses incurred through investigations, litigation, and proceedings arising from the underlying conduct; and (c) reputational harm. In addition, BASES, PACILIO, CC-1, and others, in placing Fraudulent Orders, exposed other financial institutions that were trading precious metals futures contracts to risk of loss by inducing other financial institutions to buy and sell precious metals futures contracts at quantities, prices, and times that they otherwise would not.

13. It was further part of the conspiracy that in submitting and communicating about the Fraudulent Orders and Primary Orders, BASES, PACILIO, CC-1, and others transmitted, and caused to be transmitted, wire communications from outside the State of Illinois into and through the Northern District of Illinois.

14. It was further part of the conspiracy that, for instance, on or about November 16, 2010, PACILIO placed approximately six Fraudulent Orders to buy approximately 250 silver futures contracts at various prices, in order to facilitate the execution of a Primary Order placed by PACILIO.

15. It was further part of the conspiracy that on or about November 16, 2010, while engaging in the trading activity described in Paragraph 14, PACILIO admitted that it was his intent to engage in the use of Fraudulent Orders in an electronic "chat" conversation with other traders at Bank A, including BASES and CC-1. Among other things, PACILIO wrote, "guys the algos

7

are really geared up in here. if you spoof this it really moves." PACILIO went on to explain that he "put in selling at 48 in silver. i bid 45 for 200. 46 and 47 for 20 each and got filled."

16. It was further part of the conspiracy that, as another example, PACILIO engaged in trading on or about February 11, 2011, in which he placed approximately three Fraudulent Orders to sell approximately 550 silver futures contracts at an approximate price of $29.975, with an approximate total value of $82,431,250, in order to facilitate the execution of a Primary Order by CC-1.

17. It was further part of the conspiracy that on or about February 11, 2011, PACILIO admitted in an electronic "chat" conversation with other traders at Bank A, including BASES and CC-1, that it was his intent to "push[]" the market through the trading activity described in Paragraph 16 and that CC-1 did not need to "spoof it" because PACILIO was placing Fraudulent Orders himself:

| | |
|---|---|
| PACILIO: | that was me pushing it |
| PACILIO: | dont do it yourself. i will help you |
| PACILIO: | dont spoof it |
| PACILIO: | what did you get 70 lots there? |
| CC-1: | Ok |
| CC-1: | Yep |

18. It was further part of the conspiracy that on or about June 10, 2011, as another example, BASES placed approximately four Fraudulent Orders to sell approximately 40 gold futures contracts at an approximate price of $1,545.40, with an approximate total value of $6,181,600, and five Fraudulent Orders to sell approximately 50 gold futures contracts at an

8

approximate price of $1,545.30, with an approximate total value of $7,726,500, in order to facilitate the execution of a Primary Order by CC-1.

All in violation of Title 18, United States Code, Section 1349.

## COUNT TWO
(Commodities Fraud)

The SPECIAL JUNE 2018 GRAND JURY further charges:

19. Paragraphs 1 through 18 are incorporated here.

20. Beginning at least in or around June 2009 and continuing through at least in or around January 2014, in the Northern District of Illinois, Eastern Division, and elsewhere,

EDWARD BASES,

the defendant herein, while employed as a precious metals trader at Bank A and Bank B, did knowingly and with the intent to defraud, execute and attempt to execute a scheme and artifice to defraud a person in connection with a commodity for future delivery, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of a commodity for future delivery, that is, precious metals futures contracts.

All in violation of Title 18, United States Code, Sections 1348 and 2.

## COUNT THREE
(Commodities Fraud)

The SPECIAL JUNE 2018 GRAND JURY further charges:

21. Paragraphs 1 through 18 are incorporated here.

22. Beginning at least in or around August 2009 and continuing through at least in or around October 2014, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN PACILIO,

the defendant herein, while employed as a precious metals trader at Bank A and Bank C, did knowingly and with the intent to defraud, execute and attempt to execute a scheme and artifice to defraud a person in connection with a commodity for future delivery, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of a commodity for future delivery, that is, precious metals futures contracts.

All in violation of Title 18, United States Code, Sections 1348 and 2.

### COUNTS FOUR THROUGH EIGHT
(Spoofing)

The SPECIAL JUNE 2018 GRAND JURY further charges:

23. Paragraphs 1 through 18 are incorporated here.

24. On or about the dates set forth below, in the Northern District of Illinois, Eastern Division, and elsewhere,

JOHN PACILIO,

the defendant herein, while employed as a precious metals trader at Bank C, knowingly engaged in trading, practice, and conduct on and subject to the rules of a registered entity, that is, CME Group, that was "spoofing," that is bidding and offering with the intent, at the time the bid and offer was placed, to cancel the bid and offer before execution, by causing to be transmitted, to a CME Group server, precious metals futures contract orders, as set forth below:

| Count | Approximate Date Order Placed | Approximate Time Order Placed | Contract | Approx. Price per Ounce | Approx. Number of Contracts in Order (Buy/Sell) | Approx. Total Value of Order |
|---|---|---|---|---|---|---|
| 4 | January 24, 2014 | 9:44:54 AM | Gold | $1,268.00 | 50 Buy (Bid) | $6,340,000 |

| Count | Approximate Date Order Placed | Approximate Time Order Placed | Contract | Approx. Price per Ounce | Approx. Number of Contracts in Order (Buy/Sell) | Approx. Total Value of Order |
|---|---|---|---|---|---|---|
| 5 | February 18, 2014 | 3:20:32 PM | Gold | $1,322.20 | 100 Buy (Bid) | $13,222,000 |
| 6 | February 28, 2014 | 10:31:36 AM | Platinum | $1,453.20 | 200 Buy (Bid) | $14,532,000 |
| 7 | April 17, 2014 | 10:57:48 AM | Silver | $19.635 | 100 Sell (Offer) | $9,817,500 |
| 8 | October 6, 2014 | 10:26:46 AM | Platinum | $1,244.00 | 100 Buy (Bid) | $6,220,000 |

All in violation of Title 7, United States Code, Sections 6c(a)(5)(C), 13(a)(2), and Title 18, United States Code, Section 2.

### FORFEITURE ALLEGATIONS

The SPECIAL JUNE 2018 GRAND JURY further alleges:

25. The allegations in Count One of this Indictment are incorporated here for the purpose of alleging forfeiture to the United States pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1).

26. As a result of the violations as alleged in Count One of this Indictment,

EDWARD BASES and
JOHN PACILIO,

the defendants herein, shall forfeit to the United States any and all right, title, and interest they may have in any property, real and personal, which constitutes and is derived from proceeds traceable to the offense charged in the Indictment.

27. If any of the forfeitable property described above, as a result of any act or omission

by the defendants:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third party;

    (c)    has been placed beyond the jurisdiction of the court;

    (d)    has been substantially diminished in value; or

    (e)    has been commingled with other property which cannot be divided without difficulty;

the United States of America shall be entitled to forfeiture of substitute property pursuant to the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1).

A TRUE BILL:

_____
FOREPERSON

_____
SANDRA L. MOSER
Acting Chief, Fraud Section

Ankush Khardori
Jeffery S. Le Riche
Trial Attorneys, Fraud Section

Criminal Division
U.S. Department of Justice

12