## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

-------------------------------------------------------x
                                   :

UNITED STATES OF AMERICA     :
                                     :     Case No. 18 CR 48
                                     :     Judge John Z. Lee

      v.                     :
                                     :     **Oral Argument Requested**

EDWARD BASES and JOHN PACILIO, :
                                     :

       Defendants.         :
                                     :
-------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT JOHN PACILIO'S MOTION TO DISMISS THE INDICTMENT

KOBRE & KIM LLP

111 West Jackson Blvd, 17th Floor
Chicago, IL 60604

David H. McGill
Jonathan D. Cogan
Matthew I. Menchel
Sean S. Buckley

*Counsel for Defendant John Pacilio*

**Table of Contents**

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND .........................................................................................................2

   A.   Futures Trading on COMEX ...........................................................................2

   B.   The Anti-Spoofing Provision .........................................................................3

SUMMARY OF INDICTMENT ....................................................................................4

ARGUMENT ...............................................................................................................5

   I.   Counts One and Three Fail To State an Offense ...........................................5

      A.   Applicable Law...........................................................................................5

      B.   Discussion..................................................................................................7

         1.   The Indictment Fails To Allege Fraudulent Representations..................7

         2.   Spoofing Is Not Fraud ......................................................................10

         3.   The *Coscia* Case Does Not Support a Different Result.......................12

   II.   Counts One and Three Are Unconstitutionally Vague as Applied to Mr. Pacilio.......13

      A.   Applicable Law.........................................................................................13

      B.   Discussion................................................................................................14

   III.   The ASP Unconstitutionally Restricts Commercial Speech ......................18

      A.   Applicable Law.........................................................................................18

      B.   Discussion................................................................................................19

         1.   The ASP Ensnares Truthful Speech ....................................................19

         2.   The ASP Fails The Central Hudson Test..............................................20

   IV.   Count Three Should Be Dismissed in Part for Alleging Conduct that Exceeds the Applicable Statute of Limitations ........................................................23

      A.   Applicable Law.........................................................................................23

      B.   Discussion................................................................................................24

## TABLE OF AUTHORITIES

**Cases**

*Bouie v. City of Columbia*, 378 U.S. 347 (1964) ...................................................14
*Burkhart Advertising, Inc. v. City of Auburn*, 786 F. Supp. 721 (N.D. Ind. 1991) ..................22
*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
  447 U.S. 557 (1980) ...........................................................................19, 21
*CFTC v. Oystacher*, No. 16-cv-9196, 2016 WL 3693429 (N.D. Ill. July 12, 2016) ...............9
*CP Stone Fort Holdings, LLC v. Doe*, No. 16-cv-4991,
  2016 WL 5934096 (N.D. Ill. Oct. 11, 2016) .....................................................8, 13, 20
*Edenfield v. Fane*, 507 U.S. 761 (1994) .................................................................passim
*F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) .................................14, 16, 18
*GFL Advantage Fund, Ltd v. Colkitt*, 272 F.3d 189 (3d Cir. 2001) ............................10, 16, 20
*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ...............................................14
*Jordan v. Jewel Food Stores Inc.*, 743 F.3d 509 (7th Cir. 2014) ...............................18
*Maxey v. Freightliner Corp.*, 665 F.2d 1367 (5th Cir. 1982) ...................................15
*Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97 (1987) ....................11
*Papachristou v. Jacksonville*, 405 U.S. 156 (1972) .............................................14
*Potter v. United States*, 155 U.S. 438 (1894) .................................................11
*Russello v. United States*, 464 U.S. 16 (1983) ................................................10
*Schneider v. State*, 308 U.S. 147 (1939) .....................................................19
*Skilling v. United States*, 561 U.S. 358 (2010) ..............................................17
*Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857 (7th Cir. 1995) ........................8
*Thornhill v. Alabama*, 310 U.S. 88 (1940) ....................................................19
*Toussie v. United States*, 397 U.S. 112 (1970) ...............................................24
*United States v. Askia*, 893 F.3d 1110 (8th Cir. 2018) ........................................24
*United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017) ...................................4, 11, 12
*United States v. Coscia*, No. 14-cr-0551 (N.D. Ill. Apr. 16, 2016) .........................12, 16
*United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008) ......................................8, 9
*United States v. Jaynes*, 75 F.3d 1493 (10th Cir. 1996) ......................................25
*United States v. Lanier*, 520 U.S. 259 (1997) ............................................14, 16
*United States v. Morris*, 821 F.3d 877 (7th Cir. 2016) .......................................13
*United States v. Motz*, 652 F. Supp. 2d 284 (E.D.N.Y. 2009) ..................................24
*United States v. National Dairy Products Corp.*, 372 U.S. 29 (1963) ..........................19
*United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000) ...........................................6
*United States v. Powell*, 576 F.3d 482 (7th Cir. 2009) ........................................6
*United States v. Radley*, 632 F.3d 177 (5th Cir. 2011) ..................................passim
*United States v. Radley*, 659 F. Supp. 2d 803 (S.D. Tex. 2009) ...............................16
*United States v. Risk*, 843 F.2d 1059 (7th Cir. 1988) .........................................6
*United States v. Sheneman*, 682 F.3d 623 (7th Cir. 2012) ......................................6
*United States v. Stephens*, 421 F.3d 503 (7th Cir. 2005) ......................................6
*United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016) ...................................6, 7, 9
*United States v. White*, 610 F.3d 956 (7th Cir. 2010) .......................................4, 6
*United States v. Yashar*, 166 F.3d 873 (7th Cir. 1999) ...................................23, 24, 25

**Statutes**

15 U.S.C. § 78o ................................................................................................3
18 U.S.C. § 1343 .........................................................................................6, 14
18 U.S.C. § 1348 ......................................................................................4, 6, 14
18 U.S.C. § 1349 ..............................................................................................4
18 U.S.C. § 2 ....................................................................................................4
18 U.S.C. § 3301(b) .......................................................................................23
7 U.S.C. § 13(a)(2) .....................................................................................4, 17
7 U.S.C. § 6b ..................................................................................................10
7 U.S.C. § 6c ..................................................................................................10
7 U.S.C. § 6c(a)(5) ....................................................................................4, 10
7 U.S.C. § 9 ....................................................................................................10
Dodd-Frank, Pub. L. No. 111-203, § 929-Z, 124 Stat. 1376, 1871 (2010) ..............................3
Pub. L. No. 111-203, 124 Stat. 1376 (2010), § 747 .........................................................3, 11

**Other Authorities**

Antidisruptive Practices Authority, 75 Fed. Reg. 67,301 (Nov. 2, 2010) ...............................15
Antidisruptive Practices Authority, 78 Fed. Reg. 31,890 (May 28, 2013) .................11, 15, 19

## PRELIMINARY STATEMENT

This prosecution rests on the fallacy that spoofing—the act of placing an order with intent to cancel it before execution—is a form of fraud. Indeed, the Indictment *expressly defines* spoofing as the placement of "Fraudulent Orders," even though the statute that both defines and proscribes spoofing makes perfectly clear that Congress did not regard spoofing as a species of fraud or even manipulation. Instead, as the text and structure of the statute confirm, Congress considered spoofing to be a "disruptive practice" characterized by its own distinct statutory elements and warranting a far less severe maximum penalty relative to fraud offenses. Against this statutory backdrop, the government's "fraud-by-spoofing" theory fails to state offenses for wire fraud and commodities fraud.[1]

Moreover, even if the legislative judgment of Congress could be thrust aside to redefine spoofing as fraud under today's prevailing standards, no reasonable person would have understood during the period at issue that the entry of open-market orders could be punishable as fraud, much less for the four-year period in the Indictment when spoofing was not yet illegal. By threatening to punish alleged disruptive practices with more than twice the maximum penalty authorized by Congress without fair notice, the Indictment violates John Pacilio's rights under the Due Process Clause of the Fifth Amendment of the United States Constitution.

Finally, the government's untenable prosecution theory also infringes upon the First Amendment right to engage in protected commercial speech. As a matter of law and fundamental market structure, open-market orders reflect genuine expressions of willingness to buy or sell commodity futures contracts and thus constitute commercial speech. In seeking to impose a blanket ban on all orders placed with intent to cancel before execution, the anti-spoofing statute unconstitutionally restrains legitimate commercial speech and fails to present

---

[1] For the reasons stated in Section IV below, Count Three (commodities fraud) also warrants partial dismissal for charging conduct outside the applicable limitations period.

a reasonably proportional means of achieving its aim of curbing disruptive activity.

For all these reasons, Counts 1, 3, and 4-8 of the Indictment must be dismissed.

## BACKGROUND

### A. Futures Trading on COMEX

A "futures" contract is a legally binding agreement that obligates the seller of the contract to deliver a specified amount of a certain commodity to the buyer on a future date called the "settlement date." *See* Indictment ("Ind.") at ¶ 1(g), *United States v. Bases*, No. 18-cr-48 (N.D. Ill. July 17, 2018), ECF No. 66. The Indictment here alleges a scheme involving the purchase and sale of precious metals futures contracts—including gold, silver, platinum, and palladium—on an electronic exchange known as COMEX. *Id.* at ¶¶ 1(j) & 1(r).

COMEX is an anonymous online exchange operated by CME Group Inc., one of the largest financial market companies in the world. *Id.* at ¶ 1(i). Traders who wish to buy or sell futures contracts on COMEX do so by entering an "order" in the form of a "bid" to purchase a contract or an "offer" to sell a contract. *Id.* at ¶ 1(k). An order is "filled" or "executed" when a buyer's bid and a seller's offer match for a particular contract. *Id.* at ¶ 1(m). The difference between the best available bid and best available offer in the market is referred to as the "spread" and typically equates to a "tick"—the minimum price increment at which futures contracts can trade on COMEX. *See id.* at ¶ 1(n).

COMEX aggregates all orders entered on its exchange in an anonymous "order book" made visible to every trader. *Id*. at ¶ 1(l). The order book contains only the quantity and price of bids and offers available for execution at various price levels. *Id.* No other information, such as the length of time the order will remain open or the trader's reasoning for placing the order, appears in the order book.

2

Any order placed on the exchange is binding as long as it remains on the order book.[2] COMEX rules permit traders to modify or cancel orders at any time prior to execution, but if another trader accepts an existing bid or offer by entering a market order, the exchange automatically executes a transaction and both parties are immediately bound. *Id.*

Due to the fast-moving and dynamic nature of the commodity futures market, cancellations are the norm and executions are the exception.[3] Indeed, order cancellation is so routine that COMEX makes available numerous order types that presuppose cancellation.[4]

COMEX also permits "iceberg" orders, which allow traders to conceal the true number of contracts that they wish to buy or sell at a particular price. *See* Ind. at ¶ 1(q). As the name implies, an iceberg order displays only a portion of an order to other market participants while the balance remains hidden. *Id.* If another trader runs into the iceberg and fills the displayed portion of the order, a pre-set quantity of the remaining, hidden portion automatically becomes visible. This process repeats itself until the order is either fully executed or cancelled. *Id.*

**B. The Anti-Spoofing Provision**

On July 16, 2011, the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") became law. Dodd-Frank, Pub. L. No. 111-203, § 929-Z, 124 Stat. 1376, 1871 (2010) (codified at 15 U.S.C. § 780). Section 747 of Dodd-Frank comprehensively amended the Commodity Exchange Act ("CEA"), including by amending Section 4c(a) to prohibit certain "Disruptive Practices." Pub. L. No. 111-203, 124 Stat. 1376 (2010), § 747 (codified at

---

[2] *See* N.Y. Mercantile Exch., NYMEX Rulebook Ch. 5: Trading Qualifications and Practices R. 522 (last visited Nov. 16, 2018), https://www.cmegroup.com/content/dam/cmegroup/rulebook/NYMEX/1/5.pdf.

[3] Richard Haynes & John S. Roberts, U.S. CFTC, *Automated Trading in Futures Markets* at 9 (2015), https://www.cftc.gov/sites/default/files/idc/groups/public/@economicanalysis/documents/file/oce_automatedtrading.pdf (noting that "[m]arket makers, who provide liquidity, need to be able to quickly cancel or modify standing quotes during periods of directional price movement" and "just over 50 percent of market orders are cancelled within half a second").

[4] *See* CME Group, *CME Globex Reference Guide*, at 13 & 25 (last visited Nov. 16, 2018), https://www.cmegroup.com/globexreferenceguide (describing order types).

3

7 U.S.C. § 6c(a)(5)). As relevant here, section 4c(a) of the CEA proscribes "any trading, practice, or conduct [that] is, is of the character of, or is commonly known to the trade as, 'spoofing' (bidding or offering with the intent to cancel the bid or offer before execution)." 7 U.S.C. § 6c(a)(5). The Seventh Circuit has emphasized that spoofing requires "an intent to cancel the order *at the time it was placed*." *United States v. Coscia*, 866 F.3d 782, 795 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 1989 (2018) (emphasis in original).

## SUMMARY OF INDICTMENT[5]

The Indictment charges Mr. Pacilio with conspiracy to commit wire and commodities fraud in violation of 18 U.S.C. § 1349 (Count One), commodities fraud in violation of 18 U.S.C. §§ 1348 and 2 (Count Three), and spoofing with respect to five trading episodes in violation of 7 U.S.C. §§ 6c(a)(5)(C) & 13(a)(2), and 18 U.S.C. § 2 (Counts Four through Eight). Mr. Pacilio and his co-defendant, Edward Bases, allegedly conspired over the relevant period to "deceive other market participants by injecting materially false and misleading information into the precious metals futures market." Ind. at ¶ 3. They supposedly carried out this conspiracy by "plac[ing] one or more visible orders for precious metals futures contracts on one side of the market that, at the time they placed the orders, they intended to cancel before execution (the 'Fraudulent Orders')." *Id.* at ¶ 4. According to the Indictment, the orders "falsely and fraudulently represented to market participants that [Mr. Pacilio and others] were willing to trade the Fraudulent Orders when, in fact, they were not because, at the time the Fraudulent Orders were placed, [Mr. Pacilio and others] intended to cancel them." *Id.* at ¶ 11.

The Indictment also alleges that Mr. Pacilio and others placed "lower visible quantity orders, often in the form of iceberg orders, on the opposite side of the market that they intended

---

[5] For purposes of this motion only, Mr. Pacilio accepts, as he must, the allegations of the Indictment as true. *See United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010). If this matter proceeds to trial, however, Mr. Pacilio intends to vigorously dispute the charges against him.

to execute (the 'Primary Orders')." *Id.* at ¶ 9. The Indictment accuses Mr. Pacilio and others of placing the so-called "Fraudulent Orders" with the "intent to artificially move the prevailing price in a manner that would increase the likelihood that one or more of their Primary Orders would be filled." *Id.* at ¶ 10. The Indictment also cites two electronic chats, which both notably predate the enactment of Dodd-Frank, and in which Mr. Pacilio allegedly used the words "spoof" and "push" in discussing market activity. *See id.* at ¶¶ 15-16.

The Indictment does not allege that the "Fraudulent Orders" were incapable of execution prior to cancellation or that no one executed upon those orders. In fact, the Indictment concedes that these orders exposed Bank A to "monetary trading losses associated with the trading risk that the Fraudulent Orders would be executed." *Id.* at ¶ 12.

The Indictment relies on the same factual allegations described above for each of the fraud counts. For the additional five counts of spoofing, the Indictment identifies orders that Mr. Pacilio placed during five discrete trading episodes in 2014, but does not otherwise allege facts beyond those alleged for the fraud charges. *See id.* at ¶¶ 23-24.

## ARGUMENT

### I. Counts One and Three Fail To State an Offense

The Indictment fails to allege wire fraud or commodities fraud for at least two reasons. First, the Indictment does not identify any fraudulent statements or omissions and otherwise fails to plausibly allege a fraudulent scheme. Second, the government's circular—and self-serving—definition of "Fraudulent Orders" as orders placed with intent to cancel before execution (*i.e.*, spoofing) does not substitute for allegations of fraudulent conduct.

### A. Applicable Law

An indictment is legally sufficient only if it: "(1) states all the elements of the crime charged; (2) adequately informs the defendant of the nature of the charges so that he may prepare a defense; and (3) allows the defendant to plead the judgment as a bar to any future

5

prosecutions." *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010). The Court must dismiss an indictment if "the government's characterization of the undisputed facts [do] not constitute a violation of any statute." *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988). An indictment likewise warrants dismissal if it fails to offer "enough factual particulars so the defendant is aware of the specific conduct at issue, the presence or absence of any particular fact is not dispositive." *White*, 610 F.3d at 959; s*ee also United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000).

To successfully state offenses for wire fraud and commodities fraud, the Indictment must allege, among other things, that Mr. Pacilio knowingly devised or participated in a scheme or artifice (a) to defraud or (b) to obtain money or property "by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. §§ 1343, 1348. In the Seventh Circuit, "a necessary element of a scheme to defraud is the making of a false statement or material misrepresentation, or the concealment of a material fact." *United States v. Stephens*, 421 F.3d 503, 507 (7th Cir. 2005); *see also United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016) (same).[6] To avoid dismissal of the fraud counts, the Indictment also must allege that Mr. Pacilio knowingly devised or participated in such a scheme or artifice with the specific "intent to defraud," which means acting knowingly and with the specific intent to deceive for the purpose of financial gain or to cause financial loss to another. *Weimert*, 819 F.3d at 355.

---

[6] Mr. Pacilio is cognizant of the Seventh Circuit's statement in *Coscia* that, for purposes of Section 1348(1), "[f]alse representations or material omissions are not required" for conviction. 866 F.3d 796. That statement —to the extent it is an accurate statement of the law, *see United States v. Walton*, 255 F.3d 437, 443 (7th Cir. 2001) (holding that a Court of Appeals panel "may not overturn Circuit precedent without compelling reasons")—is limited to a prosecution under the first prong of commodities fraud and does not change the long-standing requirement that, for a conviction to stand under the wire fraud statute, "[a] scheme requires 'the making of a false statement of material misrepresentation , or the concealment of [a] material fact.'" *See United States v. Sheneman*, 682 F.3d 623, 629 (7th Cir. 2012) (quoting *United States v. Powell*, 576 F.3d 482, 490 (7th Cir. 2009)). Thus, to the extent Count One alleges a conspiracy to commit wire fraud—or even a conspiracy to commit commodities fraud under Section 1348(2)—the Indictment must establish an agreement to make a false statement or material misrepresentation to adequately allege those crimes.

When scrutinizing indictments, the Seventh Circuit has cautioned that "not all conduct that strikes a court as sharp dealing or unethical conduct is a 'scheme or artifice to defraud.'" *Id.* at 357. "Deception and misdirection about a party's values, priorities, preferences, and reserve prices are common in negotiation." *Id.* at 370. "Buyers and sellers negotiate prices and other terms," and "[t]o state the obvious, they will often try to mislead the other party about the prices and terms they are willing to accept." *Id.* Under controlling law, therefore, "[s]uch deceptions are not criminal." *Id.*

### B. Discussion

#### 1. The Indictment Fails To Allege Fraudulent Representations

The Indictment's theory of fraud is set forth in paragraph 11. That paragraph contains a subtle but crucial sleight of hand. It alleges that Mr. Pacilio placed orders that amounted to "material misrepresentations that falsely and fraudulently represented to market participants that [the defendants] were willing to trade the [orders] when, in fact, they were not because, at the time the [orders] were placed, [the defendants] intended to cancel them." Ind. at ¶ 11. In plain English, the government's theory is that (a) Mr. Pacilio represented to the market that he was "willing to trade" when he placed his orders, and (b) this representation was false and fraudulent because he "intended to cancel" his orders at the time they were placed. This is a false dichotomy and highlights the incoherence of the government's theory of fraud. As a matter of basic market structure, an alleged intent to cancel does not—and cannot—render false the implied representation made by an executable open-market order in any way.

The logical fallacy in the government's allegation is not a mere drafting mistake—it is an apparent attempt to circumvent the well-settled proposition that open-market orders are necessarily "real" and "genuine" as long as "a counter-party could have accepted them and formed an enforceable contract at any time." *See United States v. Radley*, 632 F.3d 177, 183 (5th Cir. 2011); *see also Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 864-65 (7th

7

Cir. 1995) (finding no false impression of supply and demand under the securities laws when transactions are not "fictitious[]" but rather involve "real buyers" acting on real offers). Courts have come to this conclusion for good reason: orders in these markets are subject to execution at any moment, and traders have no discretion to avoid consummating trades. Indeed, in a cleared trading environment such as at CME, there is virtually zero risk that a trade, once executed, will not be consummated. As such, Mr. Pacilio's alleged implicit representation to the market that he was "willing" to trade was necessarily true—he could not avoid that trade once another trader executed on his bid or offer. *See supra* at 2, n. 1. And there is no allegation that Mr. Pacilio was somehow engaged in a scheme to defraud by reneging on executed orders.

Judge Chang's decision in *CP Stone Fort*, while a civil fraud case, is on point. In that case, the court dismissed a complaint because the allegedly fraudulent orders "were legitimate and could have been matched at any time by a willing participant placing an aggressive order." *CP Stone Fort Holdings, LLC v. Doe*, No. 16-cv-4991, 2016 WL 5934096, at *6 (N.D. Ill. Oct. 11, 2016). Judge Chang found the complaint "devoid of any allegation that defendant refused to execute on any matched orders," or of "any allegation of how many orders were executed . . . or whether the platform rules required the orders to be exposed further." *Id.*

The Second Circuit reached a similar conclusion in *United States v. Finnerty*, 533 F.3d 143, 146 (2d Cir. 2008), in which the government charged a New York Stock Exchange ("NYSE") broker with securities fraud under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934. The government alleged that the broker's practice of "interposing" his own trading book in the middle of transactions fraudulently misled customers into believing that he was matching their bids and offers pursuant to NYSE rules. *See id*. at 148-49. The *Finnerty* court rejected the argument, explaining that the defendant could not be held liable "unless [his customer's] understanding was based on a statement or conduct" made or exhibited by him. *Id.* at 150. The Court found that "[t]he government has identified no way in which

8

Finnerty communicated anything to his customers, let alone anything false," and held that the fraud count must be dismissed in the absence of "some proof of manipulation or a false statement, breach of duty to disclose, or deceptive communicative conduct." *Id.* at 148-49.

The Seventh Circuit's decision in *Weimert* is likewise instructive. In *Weimert*, the court recognized that sophisticated businessmen negotiating a transaction "do not expect complete candor about negotiating positions" and held that "[d]eception about negotiating positions— about reserve prices and other terms and their relative importance—should not be considered material for purposes of the mail and wire fraud statutes." 819 F.3d at 358. The same principle holds true for the futures markets, which essentially facilitate fast-paced negotiations of prices at which buyers and sellers are willing to transact in futures contracts. The sophisticated traders in these markets do not expect complete candor about the intent or purpose of other traders' orders—"[d]eception and misdirection about a party's values, priorities, preferences, and reserve prices are common" and lawful. *Id.* at 370. Indeed, traders are permitted, if not encouraged, to use order types that are expressly designed to conceal the true quantities and prices at which the traders want to transact.[7] While traders might be "able to secure a better deal" if they knew their counterparties' "underlying priorities" in placing bids and offers, that is not a matter for the federal fraud statutes. *Id.*

Nor is it sufficient for the government to rely on allegations that the so-called "Fraudulent Orders" were used to "create[] the false impression in the market of" increased supply or demand. Ind. at ¶¶ 7, 8. For the same reasons that the orders themselves were "real" and "genuine," any impression of supply and demand they created was equally genuine. *See*

---

[7] *See CFTC v. Oystacher*, No. 16-cv-9196, 2016 WL 3693429, at *27 (N.D. Ill. July 12, 2016) (discussing CME's authorization of "iceberg orders[,]" which "are not displayed to the rest of the market but, instead, are concealed").

*Radley*, 632 F.3d at 183 (holding that "[s]ince [the] defendants were willing and able to follow through on all of the bids, they were not misleading"); *see also GFL Advantage Fund, Ltd v. Colkitt*, 272 F.3d 189, 209-10 & 214 (3d Cir. 2001) (concluding that a trader does not "inject[] . . . inaccurate information into the market or creat[e] . . . a false impression of supply and demand for a stock" by engaging in "legitimate transactions with real buyers on the other side of the sale"). The Indictment thus fails to allege a false misrepresentation or omission, thereby necessitating, at a minimum, the dismissal of the charge for conspiracy to commit wire fraud.

### 2. Spoofing Is Not Fraud

The only other factual allegation in the Indictment underpinning the government's fraud theory appears in paragraph 4. That paragraph defines "Fraudulent Orders" as placing "one or more visible orders for precious metals futures contracts on one side of the market that, at the time they placed the orders, they intended to cancel before execution." Ind. at ¶ 4. This definition tracks the CEA's definition of "spoofing" verbatim. *See* 7 U.S.C. 6c(a)(5)(C). The government effectively conjures up a fraud by unilaterally defining non-fraudulent conduct as "fraudulent." But spoofing is different from fraud, as is clear from the text of the anti-spoofing provision ("ASP"), the framework of the CEA, and CFTC interpretive guidance.

As an initial matter, Congress deliberately chose to bifurcate the CEA's prohibitions on "disruptive" practices (which appear in Section 4, 7 U.S.C. § 6c) from its prohibitions on manipulation and fraud (which appear in Sections 4b and 6(c), 7 U.S.C. §§ 6b & 9). This exercise of legislative judgment must be respected. Indeed, if Congress had intended spoofing to be synonymous with fraud, there would be no reason to create an entirely new category of conduct and place it in a section of the CEA separate and apart from the existing prohibitions. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or

exclusion."); *see also Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 106 (1987) (whereas Congress "expressly provided" for nationwide service of process in some CEA enforcement provisions, with respect to Section 22, the absence of any express provision confirms that "such authorization was not its intention"). The separate classification of spoofing was no accident: Congress amended the CEA's manipulation and fraud provisions *at the same time* that it added the ASP, yet still kept them distinct. *See, e.g.*, Dodd-Frank §§ 741 (amending CEA § 4b) & 753 (amending CEA § 6(c)). Allowing the government to charge spoofing as "fraud" against this backdrop would render the ASP surplusage and frustrate Congress's purpose. *See Potter v. United States*, 155 U.S. 438, 446 (1894) (holding that the presence of statutory language "cannot be regarded as mere surplusage; it means something").

Underscoring the point, the fraud statutes and the ASP have entirely disparate elements. For example, to sustain a conviction under the wire fraud or commodities fraud statutes, the government must establish fraudulent intent and a false statement or deceptive scheme, but neither is required for a conviction under the ASP. Given these core statutory distinctions, alleged spoofing activity simply cannot act as a substitute for allegations of fraud.[8]

Finally, prevailing norms in the commodities futures markets recognize and condone various trading techniques that are specifically intended to project a false or misleading impression of market depth in order to induce others to trade without otherwise affecting prices. So, that alone cannot make Mr. Pacilio's alleged order activity fraudulent. To provide just one example, iceberg orders are "designed to obscure the true extent of supply or demand that lurks beneath the order book" without committing fraud. *Coscia*, 866 F.3d at 800. Such orders by

---

[8] The interpretation of spoofing as a distinct crime relative to fraud and manipulation finds support from the CFTC as well. Indeed, the CFTC has expressly stated that it "interprets the prohibitions in CEA Section 4c(a)(5) [*i.e.*, the ASP] to be distinct statutory provisions from the anti-manipulation provisions in Section 753 of the Dodd-Frank Act" (Section 6 of the CEA). *See* Antidisruptive Practices Authority, 78 Fed. Reg. 31,890, 31,892 (May 28, 2013).

their very nature are designed to conceal from the market the trader's desire to acquire larger quantities of contracts, and yet they are specifically authorized by COMEX. *See* CME Group, *CME Globex Reference Guide*, at 13 & 25, https://www.cmegroup.com/globexreferenceguide. Similarly, the markets condone the use of "partial-fill" orders, which are programmed to cancel the balance of the order as soon as a specified portion of it is filled. Thus, without allegations that the fraud involved specific steps to ensure orders could not be executed, *cf. Coscia* at 794-800, the mere placement of open-market orders with intent to cancel before execution cannot qualify as a scheme or artifice to defraud or to obtain money or property through false or fraudulent pretenses. *See Radley*, 632 F.3d at 185.

### 3. The *Coscia* Case Does Not Support a Different Result

The Seventh Circuit's decision in *United States v. Coscia* is consistent with the foregoing analysis. In concluding that charges of commodities fraud could be sustained on the facts before it, the *Coscia* panel emphasized that the defendant allegedly deployed two algorithms that had been pre-programmed to create a "totally non-existent market." *Coscia*, 866 F.3d at 797 & 800. The panel also found that Coscia's orders were "specifically designed to be cancelled if they ever risk actually being filled," and that he "structur[ed] that system to avoid the filling of large orders" and "*evade* execution." *Id.* at 794, 797 & 800 (emphasis in original). Indeed, the indictment in *Coscia* specifically alleged that his algorithm included a set of parameters that virtually assured the orders could never be executed. *See* Indictment at ¶¶ 9-11, *United States v. Coscia*, No. 14-cr-0551 (N.D. Ill. Oct. 1, 2014), ECF No. 1 ("Coscia designed his programs to cancel the quote orders within a fraction of a second automatically, without regard to market conditions."). Ultimately, the panel distinguished its decision from *Radley* and *CP Stone Fort* (discussed above) on the ground that neither involved taking steps of this kind "to avoid transactions in the large orders." *Coscia,* 866 F.3d at 797 n.64.

The key distinctions that set *Coscia* apart are nowhere to be found here. There is no

12

allegation that Mr. Pacilio used an algorithm to evade execution. And he is not alleged to have taken any steps to create a "totally non-existent market." Instead, the Indictment affirmatively alleges that his orders exposed Bank A to losses in the form of "trading losses associated with the *trading risk* that the Fraudulent Orders would be executed." Ind. at ¶ 12 (emphasis added). In other words, Mr. Pacilio's orders were available for execution, just like the orders in *Radley* and *CP Stone Fort*. See *Radley*, 632 F.3d at 183; *CP Stone Fort Holdings, LLC,* 2016 WL 5934096, at *6. Accordingly, without the extra allegations concerning the use of pre-programmed algorithms in *Coscia* that enabled the government to allege both spoofing and commodities fraud, the Indictment fails to state offenses for wire fraud and commodities fraud.

## II. Counts One and Three Are Unconstitutionally Vague as Applied to Mr. Pacilio

The Indictment's re-characterization of spoofing as a form of fraud also deprives Mr. Pacilio of his constitutional right to due process. When the charged conduct occurred, the prevailing statutory and legal guidance provided insufficient notice that spoofing could violate the fraud statutes. Indeed, for much of the relevant period, no statute or regulation had even attempted to define, let alone proscribe, spoofing. And even after the enactment of Dodd-Frank, spoofing was prohibited only insofar as it had the potential to disrupt markets, not because it was considered fraudulent. The government's novel retrofit of the fraud statutes to cover spoofing threatens to penalize Mr. Pacilio more than twice as harshly without fair notice. For this reason, too, Counts One and Three should be dismissed.[9]

### A. Applicable Law

Due process requires laws to be sufficiently clear to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and to "provide explicit

---

[9] Unlike the defendant in *Coscia*, Mr. Pacilio does not challenge the ASP as void for vagueness. Instead, he challenges the wire and commodities fraud statutes as unconstitutionally vague as applied to his alleged conduct. *See United States v. Morris*, 821 F.3d 877, 879 (7th Cir. 2016) ("Vagueness challenges to statutes . . . are examined in light of the facts of the case at hand.")

standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). "[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; [and] second, [that] precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

To that end, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997); *see Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964) ("[A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law, such as Art. I, [§] 10, of the Constitution forbids."). Thus, the "touchstone" of constitutional fair notice "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Lanier,* 520 U.S. at 267; *see Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972) ("Living under a rule of law entails various suppositions, one of which is that '(all persons) are entitled to be informed as to what the State commands or forbids.'" (citation omitted; alteration in original)).

**B. Discussion**

The commodities fraud and wire fraud statutes were actively enforced long before the passage of Dodd-Frank. *See* 18 U.S.C. § 1343 (enacted July 16, 1952); 18 U.S.C. § 1348 (enacted July 30, 2001). Nevertheless, prior to Dodd-Frank, the government did not bring any prosecutions under the commodities or wire fraud statutes—let alone any other fraud statute— targeting conduct that could be characterized as spoofing. Thus, no reasonable person would have understood at that time that the government could prosecute alleged spoofing at all, let alone as a form of fraud. *See Maxey v. Freightliner Corp.*, 665 F.2d 1367, 1376 (5th Cir. 1982)

(holding compliance with industry custom must be considered when determining whether a jury issue of on intent standard is raised.).

Even after the ASP became law in July 2011, neither the statute itself nor relevant case law provided Mr. Pacilio with fair warning that his behavior might subject him to criminal liability under the fraud statutes. As discussed above, Congress decided to regulate spoofing not because it was fraudulent, but because Congress viewed it as disruptive behavior. *See supra,* Part I.B.2. And, tellingly, months after the ASP had been added to the CEA, the CFTC felt compelled to clarify the term "spoofing" through a formal rulemaking procedure, *see* Antidisruptive Practices Authority, 75 Fed. Reg. 67,301 (Nov. 2, 2010), and did not issue guidance until more than two and a half years later in May 2013, *see* Antidisruptive Practices Authority, 78 Fed. Reg. 31,890 (May 28, 2013). Even then, the CFTC was unable to provide a concrete definition for the term and did not characterize it as fraudulent. *See id.* at 31,896 (stating that the CFTC would "distinguish between legitimate trading and 'spoofing' by evaluating all of the facts and circumstances of each particular case"). As such, there was no clear understanding within the industry that spoofing was fraudulent.

It was not until years after the enactment of Dodd-Frank, and years after the conduct alleged in the Indictment, that the Department of Justice first sought to use the wire fraud statute to prosecute spoofing as fraud. With respect to commodities fraud, the first-ever application of the statute involving alleged spoofing (in an entirely distinct context involving a pre-programmed algorithm) was not publicly announced until October 2, 2014 (*i.e.*, the very last month of the six-year period alleged in Count Three and only four days prior to the last trade referenced in the Indictment, Ind. at ¶ 24 (Count Eight)). *See* U.S. Dep't of Justice, *High-Frequency Trader Indicted For Manipulating Commodities Futures Markets In First Federal Prosecution For "Spoofing"* (October 2, 2014), https://www.justice.gov/usao-ndil/pr/high-frequency-trader-indicted-manipulating-commodities-futures-markets-first-federal (press

15

release announcing indictment of Michael Coscia as the "first federal prosecution of its kind" for commodities fraud related to spoofing). This unprecedented shift in the application of these statutes provided no meaningful notice to Mr. Pacilio that his alleged spoofing could be deemed fraudulent, let alone the constitutionally required fair notice that he could "be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Lanier*, 520 U.S. at 265 (citation omitted).[10]

To the contrary, the law as it existed at the time of the alleged conduct made clear that placing orders in the marketplace was not fraud so long as traders were willing and able to transact if counterparties accepted their bids. *See Radley*, 632 F.3d at 183-84 (affirming dismissal of indictment because "the bids in this case were real; a counter-party could have accepted them and formed an enforceable contract at any time"); *GFL Advantage Fund, Ltd.*, 272 F.3d at 207 (short selling stock to depress value of a security was not fraud because the defendant had not "inject[ed] false inaccurate information in the market or creat[ed] a false impression of supply and demand"). Even accepting the allegations of the Indictment as true, Mr. Pacilio was "willing and able to follow through on all of the bids," which at the time was the *sine qua non* for legitimate trading. *See United States v. Radley*, 659 F. Supp. 2d 803, 815 (S.D. Tex. 2009); *cf.* Ind. at ¶ 12 (alleging that Fraudulent Orders exposed Bank A (Mr. Pacilio's employer) to losses in the form of "trading losses associated with the trading risk that the Fraudulent Orders would be executed").

---

[10] Due process bars a court from applying a novel construction of a criminal conduct "that neither the statute nor *any prior judicial decision* has fairly disclosed to be within its scope." *Lanier*, 520 U.S. at 266 (emphasis added). Under the analysis in *Lanier* and its progeny, therefore, the earliest that the charges against *Coscia* could even arguably be considered "fair notice" was upon the denial of *Coscia*'s motion to dismiss—which did not occur until April 16, 2015, more six months after the conduct alleged in the Indictment. *See United States v. Coscia*, No. 14-cr-0551 (N.D. Ill. Apr. 16, 2016), ECF No. 35 (minute entry denying motion).

The Supreme Court's decision in *F.C.C. v. Fox Television Stations, Inc.* is instructive. 567 U.S. 239 (2012). In that case, the Court considered the F.C.C.'s enforcement of 18 U.S.C. § 1464, which had been enacted in 1948. Section 1464 provides that "[w]hoever utters any obscene, indecent, or profane language by means of radio communication shall be [guilty of a crime]." *Id.* at 243. In enforcing that statute, the F.C.C. had taken the position for years that the broadcast of a "fleeting expletive or a brief shot of nudity" could not be actionably indecent. *Id.* at 254. Then, in a sudden reversal of course, the F.C.C. sanctioned television stations for just such conduct. *Id.* The Court concluded that the "Commission's lack of notice . . . that its interpretation had changed . . . fail[ed] to provide a person of ordinary intelligence fair notice of what is prohibited" and, as such, was unconstitutionally vague as applied. *Id.* (citation omitted) (alteration in original); *see also Skilling v. United States*, 561 U.S. 358, 402-03 (2010) (holding that the honest services fraud statute must be confined to the consensus understanding of what constitutes honest services fraud).

Finally, the retroactive application of these statutes to conduct that is not fraudulent *per se* warrants particular scrutiny here. As demonstrated above, Congress criminalized spoofing, despite the existence of the fraud statutes, because it wanted to create a distinct category of crime for disruptive practices. *See supra*, Part I.B.2. That Congress did not intend spoofing to be treated like fraud is underscored by its determination that spoofing would be punishable by no more than 10 years of imprisonment. *See* 7 U.S.C. § 13(a)(2). By contrast, the commodities fraud statute authorizes imprisonment of up to 25 years, see 18 U.S.C. § 1348, and the wire fraud statute authorizes imprisonment of up to 30 years, see 18 U.S.C. § 1343. The added exposure to potential penalties two-and-a-half or three times greater than what Congress deemed appropriate for spoofing through expansion of the fraud statutes carries grave constitutional implications. *See Bouie*, 378 U.S. at 353 (describing such expansion as akin to an ex post facto violation). Indeed, under Seventh Circuit law, it is unlawful to "increase[e]

17

retroactively the punishment for conduct that is clearly criminal when the defendant engaged in it." *Conrad v. United States*, 815 F. 3d 324, 327 (7th Cir. 2016). And given that this rule applies even when the underlying conduct is "clearly criminal," it necessarily applies when, as here, the conduct was not clearly criminal.

In sum, no source of authority put Mr. Pacilio on fair notice that the trading at issue might be considered fraud. The Due Process Clause of the Fifth Amendment therefore precludes sweeping the alleged spoofing behavior within the purview of Sections 1343 and 1348 and "imposing an unforeseen heavier punishment" on Mr. Pacilio. *Id; see Fox Television Stations, Inc.*, 567 U.S. at 253.

## III.     The ASP Unconstitutionally Restricts Commercial Speech

As enacted, the ASP does not reasonably advance any legitimate governmental interest that outweighs the First Amendment right to publicly propose commercial transactions. By definition, a market consists of proposed commercial transactions to buy or sell products or services, and publicly uttered proposals for commercial transactions—"I will buy X for $Y"; "I will sell X for $Y"—are forms of commercial speech protected from unwarranted government regulation by the First Amendment. *See, e.g., Jordan v. Jewel Food Stores Inc.*, 743 F.3d 509, 516 (7th Cir. 2014) (defining commercial speech as "speech that proposes a commercial transaction"). By criminalizing commercial speech in the form of executable (and therefore truthful) bids and offers entered into anonymous markets, based solely on what the speaker (*i.e.*, the trader) is thinking at the time the orders are placed, the ASP goes too far in pursuing its aim of regulating disruptive practices in the commodities futures markets.

### A.  Applicable Law

To pass constitutional muster, the ASP must survive the "intermediate scrutiny" that courts apply to State-imposed restrictions on commercial speech. *See Edenfield v. Fane*, 507 U.S. 761, 797 (1994). Applying intermediate scrutiny requires this Court to determine:

(1) "whether the State's interests in proscribing [the speech] are substantial"; (2) "whether the challenged regulation advances these interests in a direct and material way"; and (3) "whether the extent of the restriction on protected speech is in reasonable proportion to the interests served." *Edenfield*, 507 U.S. at 767; *see Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 565 (1980). While "the State may ban commercial expression that is fraudulent or deceptive without further justification," where "truthful and nonmisleading expression will be snared along with fraudulent or deceptive commercial speech, the State must satisfy the remainder of the *Central Hudson* test by demonstrating that its restriction serves a substantial state interest and is designed in a reasonable way to accomplish that end." *Edenfield*, 507 U.S. at 768-69. The ASP fails the *Central Hudson* test.[11]

## B. Discussion

### 1. The ASP Ensnares Truthful Speech

As shown above, Congress classified spoofing as disruptive behavior, not manipulative or fraudulent conduct. *See supra,* Part I.B.2. The State's principal regulator for the commodity futures markets, the CFTC, affirmed this interpretation in its rulemaking process by distinguishing spoofing from fraudulent or deceptive practices and—consistent with its statutory framing—characterized spoofing as "disruptive" behavior. *See* Antidisruptive Practices Authority, 78 Fed. Reg. 31,890. It also explicitly rejected proposals to characterize "spoofing" as fraudulent, exploitive, or even misleading. *See id.* at 31,896. Moreover, by

---

[11] Because Mr. Pacilio challenges the ASP as an unconstitutional infringement of his First Amendment rights, he is entitled to demonstrate how the statute unreasonably restricts forms of commercial speech outside the ambit of the Indictment, including those in the hypothetical context. *See Thornhill v. Alabama*, 310 U.S. 88, 98 (1940) ("Where regulations of the liberty of free discussion are concerned, there are special reasons for observing the rule that it is the statute, and not the accusation or the evidence under it, which prescribes the limits of permissible conduct and warns against transgression." (citing *Schneider v. State*, 308 U.S. 147, 155 & 162-163 (1939)); *United States v. National Dairy Products Corp.*, 372 U.S. 29, 36 (1963) (noting that, in the context of First Amendment challenges, there is concern that the statute on its face "may in itself deter constitutionally protected and socially desirable conduct").

concluding that a consideration of "all of the facts and circumstances" would be necessary to distinguish between legitimate trading and "spoofing," the CFTC acknowledged that the ASP, as written, implicates legitimate order activity. *See id.*

In the commodity futures markets, proposals for commercial transactions in the form of bids and offers are displayed in an order book visible to all market participants. Ind. ¶ 1(l). But there are many other forms of information relevant to the proposed transactions that remain unseen. For example, market participants cannot know: (a) how urgently a trader needs to buy or sell; (b) whether more supply or demand lurks beneath the surface of a displayed order (as with "Hidden Quantity Orders"); or (c) how long a trader intends to keep an order open. Ultimately, when evaluating the order book, market participants can be sure of only one thing: if they accept an order while it remains open, they are entitled to consummate the transaction.

Against this backdrop of anonymized trading, in which traders may lawfully conceal their intentions in myriad ways, the *only* form of truthful speech available for consumption in the market comes in the form of bids and offers that, as a matter of fundamental market structure, constitute genuine expressions of a willingness to buy or sell for as long as they remain open. *See, e.g.*, *CP Stone Fort Holdings, LLC*, 2016 WL 5934096, at *6; *Radley*, 632 F.3d at 183; *GFL Advantage Fund, Ltd.*, 272 F.3d at 209-10.

The ASP proscribes this form of truthful speech in meaningful ways. Indeed, on its face, the statute constitutes a comprehensive ban on all orders placed in the open market with intent to cancel before execution—a ban that, as a matter of law and basic market structure, captures "truthful and nonmisleading expression" within its ambit and thus triggers application of the entire *Central Hudson* test. *Edenfield*, 507 U.S. at 768-69.

### 2. The ASP Fails The Central Hudson Test

Even assuming that the State has substantial interest in proscribing truthful, disruptive commercial speech, the ASP fails to achieve that aim in a direct and reasonable manner, and

thus fails the second and third prongs of the *Central Hudson* test. As written, the ASP's broad prohibition on placing bids or offers with intent to cancel before execution deters legitimate—and desirable—trading activity, thus violating the First Amendment's mandate that "speech restrictions be 'narrowly drawn' and extend 'only as far as the interest it serves.'" *Central Hudson*, 447 U.S. at 565.

To be sure, there are many legitimate and non-disruptive reasons why a trader might place an order with intent to cancel it before execution. For example, the government presumably would not seek to punish orders placed for risk management purposes, as when a trader places an order to hedge an existing position and intends to cancel it before execution because he or she believes that the market will move in a favorable direction. Similarly, the government presumably would not seek to stifle orders placed for purposes of price discovery, as when a trader places an order with intent to cancel it before execution because the market might lack sufficient liquidity at the desired price level.

Nor could the government credibly claim that a single-lot "ping" order placed for the purpose of exploring market depth constitutes disruptive (let alone deceptive) conduct merely because the trader intends to cancel the order before execution. Each of these examples describes legitimate, truthful, and constructive forms of commercial speech, and yet each falls squarely within the ambit of the ASP. In each example, the open-market orders expressed to the market reflect a genuine willingness to trade, and market rules guarantee that the orders are subject to execution as long as they remain open. But the trader nonetheless places the order with intent to cancel before execution, and thus technically runs afoul of the ASP due to its vast overbreadth. The ASP thus presents a paradigmatic example of why the Supreme Court considers prophylactic bans in this vein to be inherently suspect and deserving of heightened scrutiny. *See Central Hudson*, 447 U.S. at 563; *Edenfield*, 507 U.S. at 777-78 (explaining how categorical rules reduce protections afforded commercial speech "almost to nothing").

21

Further underscoring the point, the text of the ASP contains no qualifications and draws no distinctions between order types. It makes no provision for time—it applies irrespective of whether a trader intends to leave an order open in the market for five milliseconds or five hours before cancellation. It also applies without regard to whether a trader wishes to cancel an order in full or only in part. And it does not distinguish between intent to cancel and intent to modify, even though order modifications result in the cancellation of the original order and the entry of a new order.[12] Rather than account for these critical variables, the statute simply incorporates the type of blanket ban disfavored in First Amendment jurisprudence—one that fails to present a reasonably proportional means of achieving its aim of deterring disruptive trading activity. *See, e.g., Edenfield*, 507 U.S. at 770 (holding that "a blanket prohibition" on solicitation by accountants failed First Amendment scrutiny); *Burkhart Advertising, Inc. v. City of Auburn*, 786 F. Supp. 721, 730 (N.D. Ind. 1991) (holding that a total ban of certain billboards is not the most "narrowly drawn restriction" that could advance the proffered aims).

To the extent that Congress considered the rapid placement and cancellation of orders to be disruptive to the orderly operation of the commodities futures markets, there exist far narrower means of restraining that activity than imposing a blanket ban on all orders placed with intent to cancel before execution. To provide just one example, Congress could have passed a statute establishing a minimum timeframe for orders to remain open for execution in the marketplace before cancellation. Indeed, some market regulators have suggested that exchanges consider adopting this form of "speed bump." *See* U.S. Securities & Exchange Comm'n, Gregg E. Berman, What Drives the Complexity and Speed of our Markets? (Apr. 15, 2014), https://www.sec.gov/news/speech/2014-spch041514geb ("If quote cancellations are indeed too fast for the rest of the market to keep up, it might make sense to slow down this

---

[12] CME Group, *Order Cancel-Replace Request*, (last visited Nov. 16, 2018), https://www.cmegroup.com/confluence/display/EPICSANDBOX/Order+Cancel-Replace+Request.

particular aspect of the markets, perhaps with some sort of minimum quote-life requirement."). Unfortunately, Congress instead elected to impose an overly broad prohibition that goes well beyond prohibiting disruptive trading activity—one that sweeps in legitimate, truthful, and desirable commercial speech that is not intended to be disruptive, much less manipulative or fraudulent. For all these reasons, the Court should strike down the ASP as an unconstitutional infringement on the First Amendment right to engage in commercial speech.

### IV. Count Three Should Be Dismissed in Part for Alleging Conduct that Exceeds the Applicable Statute of Limitations

The Court should dismiss Count Three insofar as it alleges that Mr. Pacilio executed trades prior to July 17, 2012. The applicable statute of limitations for a charge of commodities fraud provides that a defendant must be prosecuted "within 6 years after the commission of the offense." 18 U.S.C. § 3301(b). The Indictment was returned on July 17, 2018, which means that only conduct occurring after July 17, 2012 falls within the applicable statute of limitations. All conduct alleged prior to that date therefore should be dismissed.

#### A. Applicable Law

As a general rule, statutes of limitations begin to run when the crime is complete—that is, when each element of that offense has occurred. *See United States v. Yashar*, 166 F.3d 873, 875 (7th Cir. 1999). A narrow exception has been recognized for so-called "continuing offenses," when (a) "the explicit language of the substantive criminal statute compels such a conclusion," or (b) "the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Yashar*, 166 F.3d at 875 (citation omitted).

The focus of what constitutes a continuing offense is the statutory language: "if the statute describes an offense that by its nature continues after the elements have been met, then the offense is a continuing one regardless of the nature of defendant's actions beyond that point." *Id.* at 877. The Supreme Court has admonished that the "continuing offense" doctrine must be narrowly construed because it extends the statute of limitations. *Toussie v. United*

*States*, 397 U.S. 112, 115 (1970). "For offenses that are not continuing offenses under *Toussie*, the offense is committed and the limitations period begins to run once all elements of the offense are established, regardless of whether the defendant continues to engage in criminal conduct." *Yashar.* at 879-80.

### B. Discussion

Although the Indictment characterizes Mr. Pacilio's alleged conduct as "beginning in at least in or around August 2009 and continuing through at least in or around October 2014," the government is not entitled to the benefit of the "continuing offense" doctrine. Ind. at ¶ 22. There is nothing about the statutory language of Section 1348, nor its elements, that "describes an offense that by its nature continues after the elements have been met[.]" *Yashar*, 166 F.3d at 875; *see United States v. Motz*, 652 F. Supp. 2d 284, 294 (E.D.N.Y. 2009) (granting partial motion to dismiss and concluding that, "[a]lthough it is true that securities fraud schemes are frequently carried out over a period of time, 18 U.S.C. § 1348 itself does not contemplate a prolonged course of conduct"). Each time Mr. Pacilio engaged in an allegedly fraudulent trade, the applicable statute of limitations began to run with respect to each alleged violation. *See Motz*, 652 F. Supp. 2d at 294; *United States v. Askia*, 893 F.3d 1110, 1119 (8th Cir. 2018) (holding that embezzlement is not a continuing offense because the crime is complete once the elements are established).

The fact that commodities fraud may frequently be carried out over a period of time, or the fact that Mr. Pacilio has been charged with repeatedly violating the statute over a period of time via the same trading activity, "does not transform 18 U.S.C. [§] 1348 into a 'continuing offense' for statute of limitations purposes." *Motz*, 652 F. Supp. 2d at 294; *see Yashar*, 166 F.3d at 877 ("[T]he active or passive nature of a defendant's actions has never been the benchmark of a continuing offense under *Toussie*."); *United States v. Jaynes*, 75 F.3d 1493, 1506 & n.12 (10th Cir. 1996) ("A continuing offense is not the same as a scheme or pattern of

illegal conduct. . . . Separate offenses may be part of a common scheme without being "continuing" for limitation purposes."). As the Seventh Circuit explained, the focus of what constitutes a "continuing offense" is the statutory language and whether Congress intended for the crime to extend the statute of limitations because "each day brings a renewed threat of the evil Congress sought to prevent." *Yashar*, 166 F.3d at 875 (citation omitted). In sum, it does not matter that the government has chosen to charge Mr. Pacilio's alleged fraudulent trades under one count rather than separate counts. The government's choice does not have the effect of delaying the running of the limitations period, which serves as a "check on governmental delay in prosecution" and is not a "function of prosecutorial discretion." *Id.* at 879.

Accordingly, the six-year statute of limitations renders untimely all of Mr. Pacilio's conduct prior to July 17, 2012, and the Court should grant a partial dismissal of Count Three.

## CONCLUSION

WHEREFORE, defendant John Pacilio respectfully requests that the Court grant the foregoing Motions to Dismiss the Indictment.

Dated: November 16, 2018                    Respectfully submitted,

                                            KOBRE & KIM LLP


                                            By: /s/_____
                                                 David H. McGill
                                                 111 West Jackson Blvd, 17th Floor
                                                 Chicago, IL 60604
                                                 (312) 429-5100
                                                 david.mcgill@kobrekim.com


                                                 Jonathan D. Cogan
                                                 Matthew I. Menchel
                                                 Sean S. Buckley

                                                 *Counsel for Defendant John Pacilio*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on November 16, 2018, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will provide notice of the filing to counsel for the government.

<u>  /s/                       </u>
David H. McGill