**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 18 CR 48 |
| | : | Judge John Z. Lee |
| v. | : | |
| EDWARD BASES and JOHN PACILIO, | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT JOHN PACILIO'S**
**RULE 29 MOTION FOR A JUDGMENT OF ACQUITTAL**

David H. McGill
Sean S. Buckley
Jonathan D. Cogan
Matthew I. Menchel
George Stamatopoulos

Kobre & Kim LLP
111 West Jackson Blvd, 17th Floor
Chicago, IL 60604

*Counsel for Defendant John Pacilio*

Mr. John Pacilio respectfully submits this memorandum of law in support of his Rule 29 motion for a judgment of acquittal on Count 19 of the Third Superseding Indictment.

**INTRODUCTION**

The indictment was returned on July 17, 2018, and the statute of limitations for commodities fraud is six years. Thus, as to Count 19, the government had to prove beyond a reasonable doubt that Mr. Pacilio's alleged fraudulent scheme extended beyond July 17, 2012. Trial Tr. at 2247:3–4, ECF Nos. 634–44. At trial, the government presented evidence as to twenty-seven trading episodes in which it alleged that Mr. Pacilio engaged in such a scheme. GX-1; GX-21. These episodes occurred in two separate timeframes approximately three years apart, during which Mr. Pacilio worked for different employers: (1) twenty episodes between August 20, 2009 and February 11, 2011, when Mr. Pacilio was working for Bank of America (the "pre-Dodd-Frank Episodes"); and (2) seven episodes between January 24 and October 9, 2014, when Mr. Pacilio was working for Morgan Stanley (the "2014 Episodes"). Because the last of the pre-Dodd-Frank Episodes occurred before July 17, 2012, the government had to prove beyond a reasonable doubt that Mr. Pacilio carried out his alleged scheme in at least one of the 2014 Episodes or some other instance within the limitations period to sustain a conviction for Count 19.

At trial, the government presented no evidence from which a rational juror could conclude beyond any reasonable doubt that Mr. Pacilio traded with fraudulent intent after July 17, 2012. The only evidence as to Mr. Pacilio's trading after July 17, 2012 consisted of: (i) charts summarizing Mr. Pacilio's trading in the 2014 Episodes; and (ii) vague testimony from Mr. Harnaik Lakhan about perceived "silver spoof trades" untethered to any specific trading episodes. *See* Trial Tr. at 815:8–817:8, ECF Nos. 634–44. Notably, even these limited strands of evidence contradicted each other. Whereas the charts for the 2014 Episodes only showed examples of Mr. Pacilio placing a single visible order opposite an iceberg order (*see* GX-1, Episode Nos. 44–50),

Mr. Lakhan testified to an altogether different pattern of spoofing in which Mr. Pacilio purportedly placed "a large number of non-iceberged trades on the opposite side" of an iceberg order. Trial Tr. at 817:3–8, ECF Nos. 634–44.[1]

The government offered no chats or percipient witness testimony for the 2014 Episodes. Nor did it offer any expert opinion to support an inference of intent from a purported "pattern" reflected in the charts (which Mr. Lakhan contradicted). As government witnesses conceded, given how common it is for traders to place orders of different sizes and types on both sides of the market, it is difficult, if not impossible, to discern a trader's intent from trading data or charts. *See, e.g., id.* at 80–81, 98, 138–42, 154, 160, 163, 314–17, 1122, 1391–92, 1444–45, 1467, 1488, 1504–05, 1568–69. Thus, as Professor Daniel Fischel (whom the government has repeatedly retained in its own matters) credibly explained, the charts failed to support any inference at all as to Mr. Pacilio's intent, let alone one sufficient to overcome any reasonable doubt as to his state of mind at the time. *See, e.g., id.* at 1829, 1850, 1853, 1948–50.

Nor do charts and chats from 2009 - 2011 present a basis for a rational juror to conclude that Mr. Pacilio acted with specific intent to defraud in trading episodes that occurred *years* later. The multi-year gap between episodes on its own raises substantial doubt that Mr. Pacilio's 2014 trading was part and parcel of a scheme to defraud that allegedly started in 2009. The fact that government witnesses confirmed the 2014 Episodes to reflect only unremarkable trading characteristics insufficient to support any conclusion as Mr. Pacilio's intent only reinforces the irrational nature of the jury's verdict as to Count 19.

For all these reasons and those set forth below, the Court should set aside the verdict and enter judgment of acquittal on Count 19 of the Third Superseding Indictment.

[1] This supposed pattern more closely resembled the style of trading deployed by Mr. Edward Bases, and yet the jury somehow convicted Mr. Pacilio of commodities fraud while acquitting Mr. Bases.

## APPLICABLE LEGAL STANDARD

A trial court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a), (c). In deciding whether to enter such a judgment, the court examines the evidence "in the light most favorable to the government to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt." *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019). "[T]he height of th[is] hurdle depends directly on the strength of the government's evidence," because even a "properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt." *Id.* at 496–97. The "government may not prove its case… with conjecture camouflaged as evidence." *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013) (citation and internal quotation marks omitted).

## ARGUMENT

### I. The Trial Produced Insufficient Evidence to Allow a Rational Juror to Conclude that Mr. Pacilio Acted with Intent to Defraud After July 17, 2012.

As a threshold matter, the government neither identified nor introduced any evidence of fraudulent trading episodes for the period between the last pre-Dodd-Frank Episode and the first 2014 Episode,[2] an almost three-year period between February 11, 2011, and January 24, 2014.

For Mr. Pacilio, the only evidence that the government introduced in relation to episodes of alleged fraudulent trading after July 17, 2012, consisted of:

- Summary charts of the seven 2014 Episodes showing what the government framed as a pattern of fraudulent trading (*i.e.*, placing orders to buy and sell, and cancelling a "large" visible order "shortly" after an iceberg executes); (GX-1, Episode Nos. 44–50)
- Testimony from Mr. Lakhan about an unidentified instance of perceived spoofing in 2014 that was not tethered to the 2014 Episodes, which described trading inconsistent

[2] The 2014 Episodes occurred between January 24 and October 9, 2014, when Mr. Pacilio was employed with Morgan Stanley Capital Group Inc. ("Morgan Stanley"). The episodes were numbered 44 through 50.

> with the government charts. *Compare* GX-1, Episode Nos. 44–50 *with* Trial Tr. at 815:8–817:8, ECF Nos. 634–44 (describing alleged "spoof trades in silver" by Mr. Pacilio using a "large number of non-iceberged" orders); *see also id.* at 8:13–17 ("[E]ach defendant had their own signature way of spoofing. *The defendant Pacilio, he would place one massive spoof order in the market. The defendant Bases, he would place several spoof orders in the market, all at the same time*.") (emphasis added).

No rational juror could conclude beyond a reasonable doubt, based on these conflicting strands of evidence, that Mr. Pacilio engaged in a commodities fraud scheme after July 17, 2012, particularly since the government adduced no percipient witness testimony or chats for the 2014 Episodes.[3]

A. <u>The Government's Summary Charts Do Not Constitute Evidence That Mr. Pacilio Acted with Intent to Defraud.</u>

Throughout trial, the government advanced the theory that the episodes shown in its summary charts followed a four-step pattern:

> Step No. 1, they placed something called an iceberg order… Step 2… The defendant Pacilio, he would place one massive spoof order in the market… Step No. 3… The spoof order worked… It pushed the prices to where the defendants wanted to buy and sell with the icebergs… Step 4, cancel the spoof.

*Id.* at 7:8–9:21. The government's summary charts of the 2014 Episodes thus show seven discrete sequences of trading by Mr. Pacilio that share the following characteristics:

- **Placing bids and offers simultaneously**: Mr. Pacilio placed an order on one side of the market (*i.e.*, a bid or an offer) without displaying the full quantity for that order (*i.e.*, an "iceberg order") and then placed an order for a fully-displayed quantity larger than that of the iceberg order (a "visible order") on the other side of the market (*e.g.*, a bid if the iceberg was an offer or an offer if the iceberg was a bid);

- **"Quick" cancellation of the visible order after fulfilment of the iceberg**: Mr. Pacilio cancelled his visible orders within a range of one to two and a half seconds;

- **Visible orders placed at the best available price or better**: Mr. Pacilio placed his visible bid or offer at the best available price (or improved the best price) in the market

[3] Mr. Pacilio is not the only one to perceive a lack of sufficient evidence against him for alleged wrongdoing in 2014. It is no coincidence that the CFTC did not pursue an enforcement action against Mr. Pacilio, despite having done so with respect to several other traders that faced similar charges. Nor is it a coincidence that the DOJ did not require Morgan Stanley to enter into any form of resolution.

> in six of the seven episodes at issue. In the seventh episode, he placed his order one tick away from the "worst" place to enter it if his goal was to avoid execution.

*See* GX-1, Episode Nos. 44–50; Trial Tr. at 151:22–25, ECF Nos. 634–44 (Scheerer). These characteristics—alone or in combination—do not remotely give rise to an inference of fraudulent intent, as the government's own witnesses consistently testified that they were common, fully consistent with market rules, and inconsistent with an intent to evade execution.

First, as for placing bids and offers simultaneously, the government's witnesses testified that this style of trading was both common and consistent with market rules. For example, Mr. John Scheerer, Senior Director in the Global Operations of the CME Group, Inc. ("CME"), testified that this type of trading was common and part of typical trading strategies:

> Q. Now, in these markets, sir, am I correct that it would be extremely common for a trader to place an order on the sell side and also the buy side at the same time?... A. Yeah, it's not uncommon to see a trader place a two-sided market… Q. And market makers, as part of their strategy, all day long rest orders on both sides of the market; right? A. Yes.

*Id.* at 138:18–139:11; *see also id.* at 139–140. Mr. Robert Sniegowski, an Executive Director at the CME's Rules and Regulatory Outreach Group, likewise testified that placing orders on both sides of the market is permissible. *Id.* at 315–317. Indeed, Mr. Scheerer testified that this form of trading provides valuable liquidity to the marketplace. *Id.* at 85.

Second, as to the "quick" cancellations of visible orders after the fulfilment of iceberg orders, the government's witnesses consistently verified that cancelling orders—in mere milliseconds or faster—was likewise commonplace, and consistent with exchange rules as well as other traders' understanding of those rules:

- **Cancelling orders in milliseconds or faster was common behavior**: *id.* at 135:11–136:10 (Scheerer) (cancellations are "very common"); *id.* at 123:19–21, 157:2–6 (Scheerer) (algorithms cancel "many more orders than manual traders" and can do so in under 5 milliseconds); *id.* at 1036:22–1037:4 (Lakhan) (agreeing "correct" that "the vast majority of orders… are cancelled quickly"); *id.* at 1465:5–12 (Pettey) (testifying it was "probably true" that "most orders… are canceled before execution"); *id.* at

1467:19–1468:15 ("perfectly legitimate" to cancel based on "evolving market conditions," which can change in "microseconds"); *id.* at 1561:5–12 (Twells) ("Q… [I]n your experience, orders can be placed and canceled within five milliseconds or less in these markets, right?… A. Yeah, I'd agree with that.");

- **The exchange did not impose time or other limits upon cancellation**: *id.* at 106:22–107:10 (Scheerer) ("Q. There's no minimum amount of time that an order needs to stay open in CME markets -- A. Correct."); *id.* at 855:4–23 (Lakhan) (orders can be cancelled "for any time, for any reason"); *id.* at 1505:17–20 (Twells) ("orders can be cancelled at any time for any reason");

- **There is no expectation that orders will remain open**: *id.* at 107:12–108:1 (Scheerer) ("Q… And there's no expectation in these markets that any order will stay open for any particular amount of time, correct? A. Correct. Q. Because a trader can cancel an order at any time, right? A. Correct. Q. So when a trader places an order, the trader isn't making any promises about how long that order is going to stay open and available in the market, are they? A. Correct."); *id.* at 1561:14–1562:4 (Twells) ("Q. And to the extent an order is placed or canceled in five milliseconds or less in these markets, does that lead you to draw any conclusions as to whether it was a real order? A. The speed -- not -- not in my experience, I don't think the speed has any -- I don't -- those two things don't go together.").

Third, the trial testimony proved that placing bids and offers at or approaching the best price, as Mr. Pacilio did in each of the seven 2014 Episodes (including the episode underlying the spoofing count for which he was acquitted), was inconsistent with an intent to avoid execution due to the high risk of the orders executing. *Id*. at 151:22–25 (Scheerer) ("top of book" is the "worst" place to enter an order if the goal is to avoid execution); *id.* at 256:22–257:1 (Sniegowski) (orders placed at best price at the "greatest" risk of execution); *id.* at 390 (Garibotti) (same).

Still more, another government witness, Mr. John Juul, a compliance manager from Deutsche Bank, testified that characteristics of the same ilk as those reflected in the 2014 Episode charts are not sufficient to detect spoofing, let alone prove a trader's intent beyond a reasonable doubt, absent some other information beyond those characteristics:

> Q. Is there anything about the characteristics of spoofing that make it difficult to detect? A. Yes, because it's all about intention. And, so, absent some communication or some information that demonstrates the intention of the trader at the time, it becomes more difficult to establish that an order was a spoof.

*Id.* at 1122:20–25. Mr. Juul's observation that it is difficult to detect spoofing applies with even greater force to commodities fraud, an offense which requires the government to prove beyond a reasonable doubt not only an intent to cancel visible orders but a specific intent to defraud.

For all these reasons, whether viewed on their own or in combination with Mr. Lakhan's conflicting testimony, the government's summary charts for the 2014 Episodes fail to provide a sufficient basis to support the jury's finding that Mr. Pacilio acted with specific intent to defraud after July 17, 2012, as necessary to sustain the conviction against him on Count 19.

### B. <u>Professor Fischel Convincingly Refuted the Government's "Pattern" Theory.</u>

Even if the Court were to credit the characteristics in the 2014 Episodes as indicia of fraud, discount Mr. Juul's testimony as to this point, and assume—for argument's sake—that trading patterns, standing alone, can suffice as proof of fraudulent intent beyond reasonable doubt, the government's slanted selection of the trading episodes negated any potential inference of fraud. As the Court observed for itself, the government built and presented its case at trial around the theory that the 2014 Episodes followed a pattern that was representative of Mr. Pacilio's trading and his alleged intent to trick other market participants and move the commodities markets in his favor by placing visible orders that he never intended to execute. *Id.* at 1540:21–24 ("MR. PERRY: In any event, we're not disputing that we placed a particular pattern at issue. We clearly have, right?"); *see also id.* at 7–9 (describing the four-step pattern). Professor Fischel's testimony demonstrated that this purported "pattern"—including the seven 2014 Episodes—was not representative of Mr. Pacilio's broader trading and, therefore, could not be relied upon as proof of Mr. Pacilio's intent beyond a reasonable doubt. *See, e.g., id.* at 1736–37, 1799, 1801–05, 1807–11, 1819, 1822, 1824–25, 1828–29, 1904, 1910, 1918–20, 1943, 1952, 1954.

As Professor Fischel testified, the government's analysis of Mr. Pacilio's trading in these episodes was plagued by selection bias that failed to account for a statistically adequate spectrum

of Mr. Pacilio's trading and therefore precluded reliable conclusions as to Mr. Pacilio's intent based on those episodes alone:

> Q. And have you reviewed the subset of the government's 72 trial episodes that include trading by Mr. Pacilio? A. I have. Q. And do you understand that of those, only 27 involve Mr. Pacilio; is that right? A. I understand that. Q. And have you also reviewed other trading sequences involving Mr. Pacilio in which large visible orders were placed opposite icebergs? A. Yes, I have. Q. And based on that analysis, have you formed any opinions about the government's case? A. Yes, I have. That the government's case is based on a really basic fundamental misunderstanding of trading behavior. And also that the sample of orders and trades that the government includes in its four-step fraudulent scheme is a biased and unrepresentative sample of Mr. Pacilio's trading behavior. In other words, there are many visible orders placed by Mr. Pacilio opposite icebergs; that there are many large orders that Mr. Pacilio places. And I think to really form an accurate understanding of the data, you can't limit the data to what appears in these four steps, given the massive amount of data that exists. I think you have to look at all of it to have a reasonable understanding of the data and what the data shows.

*Id.* at 1736:10–1737:7.

> Q. And, again, sir, as an economist, does that give you concern, that out of the 608 episodes where Mr. Pacilio and Mr. Bases were on opposite sides of the market, the government has chosen to show the jury five? A. Yes. It raises a serious concern of what statisticians refer to as selection bias. Q. What do you mean by selection bias? What does that term mean? A. Selection bias is where you reach a conclusion based on a biased and unrepresentative sample of whatever the data that you're looking at, and if you looked at the full set of data, you would reach a different conclusion.

*Id.* at 1799:9–20; *see also id.* at 1801:11–1804:1 (not appropriate to "draw conclusions about one's intent" from a small sample size, because "you're not looking at the full data set; and, therefore, you may get the wrong answer."); *id.* at 1805:2–7 (charts provide a "classic example of selection bias, of drawing a conclusion based on an unrepresentative and biased sample of data").

Professor Fischel also credibly explained how an objective analysis of Mr. Pacilio's trading data tended to disprove the government's theory that he could have expected—or intended—to achieve a particular outcome (*i.e.*, to facilitate execution of icebergs and avoid the execution of visible orders) in any of the episodes identified by the government, including the 2014 Episodes.

In particular, Professor Fischel testified that the episodes selected by the government systematically omitted alternative or even "opposite" outcomes reflected in the broader trading, thereby negating any inference that the government hoped to draw as to Mr. Pacilio's intent:

> Q. So, in your opinion, are the government's claims concerning the trading behavior consistent with this published article? A. No. Q. Why not, briefly? A. Briefly, because the government's four-step alleged fraudulent scheme only takes into account one of the possible reactions of traders in the marketplace and ignores the other two. And for that reason, the government's alleged scheme is fundamentally inconsistent and contradicted by the academic research on trading behavior.

*Id.* at 1753:5–15.[4]

> Q. Does the fact that the pattern can be just the opposite have any relevance to you as to whether or not one can or cannot infer the intent of what's in the trader's mind at the time the trader places these orders? A. Yes, it has significance to me. Q. How so? A. Because you have all different outcomes… There is no one pattern that occurs like clockwork. You have many, many different patterns; and, therefore, it is, in my opinion, not correct to look at one of the many different patterns and say that that is what was in the mind of the trader the whole time, as opposed to just as easily saying that the trader had the intent to do something else when they have some other outcome.

Trial Tr. at 1850:1–15, ECF Nos. 634–44. Professor Fischel persuasively testified that the government's trial episodes—including the seven 2014 Episodes—were biased and thus led to incorrect inferences concerning Mr. Pacilio's intent:

> Q… [W]hat can you conclude when you compare the government's trial episodes to all the episodes in which Mr. Pacilio, during the period of time, 2008 to October 2014, was placing large visible orders opposite iceberg orders? A. You conclude, again, that if you look at a biased and non-representative sample of data, you get the wrong answer, a very different answer, than if you look at the complete set of data.

---

[4] The government cannot seriously contest the credibility of Professor Fischel's testimony on this point, given that he drew upon an article written by the government's own expert, Professor Kumar Venkataraman. *Compare id.* at 1744–49 *with* DX-147 at 364. Not surprisingly, rather than challenge the substance of Professor Fischel's analysis, the government instead focused its cross-examination on whether he had reviewed and how he interpreted the "chats" that involved Mr. Pacilio, which—in keeping with Mr. Juul's testimony—only further underscores the glaring absence of any chats for the 2014 Episodes.

*Id.* at 1807:20–1808:2; *see also supra* at 7.

Before trial, the government argued that Professor Venkataraman had analyzed the representativeness of its episodes, which was a threshold issue bearing upon the reliability and admissibility of his testimony. Gov't's Opp. Defs.' Mot. Exclude Expert Test. Kumar Venkataraman at 13, ECF No. 423. At trial, the government likewise represented that this same expert would explain the import of its purported pattern as to Mr. Pacilio's intent, and why the trial episodes that observed the pattern were representative of that intent and not prejudicially and improperly "cherry-picked." Trial Tr. at 551:11–25, ECF Nos. 634–44 (Perry) (explaining that Professor Venkataraman would be the "expert coming to testify about these fills and ratios and statistics and all that"); *see also id.* at 516–519 (Garibotti) (identifying Professor Venkataraman as the one responsible for analyzing Mr. Pacilio's trading data). But the government never called Professor Venkataraman.

It thus failed to adduce expert testimony or indeed any evidence from which a rational juror could find: (i) the purported pattern in the 2014 Episodes to be probative of Mr. Pacilio's intent; or (ii) that the episodes themselves are representative and not mere coincidences or statistical anomalies among the thousands of trades placed by Mr. Pacilio in 2014. Without the benefit of expert testimony, it would be impossible for a rational juror to draw upon charts summarizing seven isolated episodes to conclude beyond a reasonable doubt that, in 2014, Mr. Pacilio resumed his alleged fraudulent scheme, after an inexplicable three-year gap.

Because the summary charts are the only evidence that the government presented at trial with respect to the 2014 Episodes placed at issue for trial, and because these charts do not suffice to prove Mr. Pacilio's alleged intent to defraud beyond a reasonable doubt, the government failed to carry its burden with respect to any of these episodes.

C. Mr. Lakhan's Testimony Cannot Support a Finding That Mr. Pacilio Acted with Intent to Defraud Within the Limitations Period.

The only other evidence that the government presented at trial in support of Count 19 within the limitations period (but unrelated to any of the 2014 Episodes) was Mr. Lakhan's incredible testimony about a single purported instance of "spoofing" by Mr. Pacilio in 2014:

> Q. And was there a time when you observed any instances where you believed Mr. Pacilio was still spoofing? A. Yes, there was. Q. Can you tell the jury about that? A. There's -- one clear example was, I was in London, obviously, and I saw some silver spoof trades done by Mr. Pacilio… Q. So, Mr. Lakhan, I would like you to just describe to the jury what you saw, without telling the jury what someone else may have said, okay?.. A. I saw Mr. Pacilio place spoof trades in silver. Q. And why do you believe that they were spoof trades as opposed to just some other trades? A. It was a similar pattern where you've got an iceberg order on the one side, a large number of non-iceberged trades on the opposite side, getting your fills on one side, and other one's canceled very quickly. Q. What was your reaction when you saw this? A. I was disappointed.

*Id.* at 815:8–817:10. Mr. Lakhan's testimony cannot support the jury's verdict as to Count 19 because: (i) it was completely untethered to any of the 2014 Episodes; (ii) it lacks internal consistency insofar as Mr. Lakhan initially referred to "one clear example," only to then reference multiple "silver spoof trades" in the same breath; (iii) his testimony lacks any independent corroboration in the trial record; (iv) it describes a layering strategy that is entirely inconsistent with the 2014 Episodes (as well as the single "massive" order spoofing strategy ascribed to Mr. Pacilio by the government (*id.* at 8:13–17)); (v) Mr. Lakhan is not a "mind reader," as another government witness admitted would be necessary to discern the intent behind another trader's order (*id.* at 1467:7–17 (Pettey)); and (vi) Mr. Lakhan admitted to being dishonest and was repeatedly caught in outright lies on cross-examination. *See, e.g.*, *id.* at 1070:17–1072:8 (Mr. Lakhan admitting that his receipt of $30,000 pursuant to an agreement with Morgan Stanley required him to confirm that Mr. Pacilio was not spoofing, the "exact opposite" of what he testified in Court to receive the benefits of his non-prosecution agreement with the government); *id.* at

929:14–932:5 (Mr. Lakhan testifying in Court that he "knew exactly" how Mr. Bases was trading at Bank of America despite a contemporaneous chat with trader Mr. Ian Penney, in which Mr. Lakhan said he had "zero idea and never did" as to what Mr. Bases did at Bank of America). In short, as the Court observed for itself, Mr. Lakhan showed himself to be an incredible witness whose testimony deserves no weight. *See Garcia*, 919 F.3d at 503 ("A judge must take special care to guard against the possibility that a defendant might be found guilty by either speculation or mere association. Circumstantial evidence that leads only to a 'strong suspicion that someone is involved in a criminal activity is no substitute for proof of guilt beyond a reasonable doubt.'" (quoting *Piaskowski v. Bett*, 256 F.3d 687, 692 (7th Cir. 2001)).

Given Mr. Lakhan's overall demeanor, the inconsistency—and evident dishonesty—of his testimony, the manner in which it conflicted with the 2014 Episodes (not to mention his own observations about Mr. Pacilio's trading style), the lack of any corroborating evidence in the record for the episode, and the fact that seven years had passed since he purportedly observed Mr. Pacilio's trading, no rational jury could have credited his testimony as a sufficient basis to conclude beyond a reasonable doubt that Mr. Pacilio acted with intent to defraud in this purported 2014 episode (or episodes, depending on which portion of the testimony one considers).[5]

## CONCLUSION

For all the reasons stated herein, Mr. Pacilio respectfully requests that the Court set aside the verdict as to Count 19 of the Third Superseding Indictment and enter a judgment of acquittal.

[5] In addition, the same reasons that support a judgment of acquittal as to the wire fraud counts—*i.e.* the lack of evidence showing that Mr. Pacilio knowingly misrepresented his trading interest in placing the challenged orders—also support a judgment of acquittal as to Count 19. The trial produced no evidence of Mr. Pacilio deploying a fraudulent trading device such as the pre-programmed algorithm in *United States v. Coscia*, 866 F.3d 782 (7th Cir. 2017).

In the alternative, Mr. Pacilio requests a new trial on Count 19 pursuant to Rule 33 of the Federal Rules of Criminal Procedure.[6]

Dated: September 22, 2021

Respectfully submitted,

KOBRE & KIM LLP

By: /s/ David H. McGill
David H. McGill
111 West Jackson Blvd, 17th Floor
Chicago, IL 60604
(312) 429-5100
david.mcgill@kobrekim.com

Sean S. Buckley
Jonathan D. Cogan
Matthew I. Menchel
George Stamatopoulos

*Counsel for Defendant John Pacilio*

[6] A new trial is also warranted under Rule 33 if "the verdict is against the manifest weight of the evidence." *United States v. Washington*, 184 F.3d 653, 657–58 (7th Cir. 1999). In making that determination, the district court "may reweigh the evidence, taking into account the credibility of witnesses," and it is not required to consider the evidence "in the light most favorable to the prosecution." *Id.* (noting the difference between this standard and the one used for a Rule 29 motion for judgment of acquittal). "If the complete record, testimonial and physical, leaves a strong doubt as to defendant's guilt, even though not so strong a doubt as to require a judgment of acquittal, the district judge may be obliged to grant a new trial." *United States v. Morales*, 910 F.2d 467, 468 (7th Cir. 1990).